506 So.2d 137 (1987)
A & B RESTAURANT EQUIPMENT, INC.
v.
HOMESEEKERS SAVINGS AND LOAN and Latter & Blum, Inc., Relators.
No. CA-6526.
Court of Appeal of Louisiana, Fourth Circuit.
April 9, 1987.
Rehearing Denied May 20, 1987.
*138 Sidney L. Shushan, Guste, Barnett & Shushan, New Orleans, for plaintiff-appellant.
Paul J. Mirabile, Middleberg & Riddle, Metairie, for Homeseekers Sav. & Loan Assn.
Mitchell J. Hoffman, Jenny Brown Lacour, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, Latter & Blum, Inc., relators, for defendants-appellees.
Before SCHOTT, WARD and WILLIAMS, JJ.
SCHOTT, Judge.
In this suit, plaintiff, the purchaser of commercial property, seeks a diminution in the purchase price because of alleged latent defects in the roof and hidden termite damage. He also claims damages against the seller and the seller's real estate agent because they allegedly misrepresented the number of square feet in the building. The case was tried to a commissioner who recommended to the judge that the case be dismissed. From a judgment of the district judge dismissing the suit the purchaser has appealed contending primarily that the trial court's factual findings are manifestly erroneous.
The property involved in this case is located on Washington Avenue in New Orleans and was, before December, 1979, the home of the Russell Ice Cream Company. This company had gone bankrupt and the plant was closed for some time when defendant, Homeseekers Savings & Loan Association, foreclosed on the property and bought it at the sheriff's sale. Home-seekers *139 then listed the property for sale with defendant, Latter & Blum, Inc., a real estate broker.
Plaintiff, Rufus Abshire, operated a restaurant equipment business. He was contacted by Emmett Russell, one of the principals of the defunct ice cream business about purchasing some of the equipment in the plant. After showing plaintiff some of the equipment, Russell informed Homeseekers that plaintiff might be interested in purchasing the property. Homeseekers representative, Ted Wunder, relayed this information to Latter & Blum's agent, Herbert Stringer, who contacted plaintiff.
Plaintiff inspected the property on December 14, 1979 and on that day, signed an agreement to purchase it for $200,000. The act of sale was passed on February 18, 1980. A few days later when it rained plaintiff discovered that the roof leaked. Over the next several months plaintiff operated his business on the premises but was severely hampered by extensive roof leaks which could not be stopped despite efforts by his employees to patch the roof. Also following his purchase Abshire discovered that a second floor section was ruined by termites after he moved some pallets and boxes which had been stored in this area and left by the ice cream company.
On September 12, 1980 Abshire filed suit against Homeseekers and Latter & Blum for a rescission of the sale and for damages to his business. On June 10, 1982 Abshire amended his petition to seek a reduction in the purchase price and increased damages based upon allegations that Homeseekers and Latter & Blum had informed Abshire that a new roof had been installed on the premises; that they knew about the defects and unsound condition of the roof; and that they failed to disclose and actively concealed the defects. On November 18, 1982 Abshire further amended his petition to allege that he discovered an additional latent defect consisting of a shortage of 10,637 square feet in the building. Finally, on December 10, 1984 Abshire amended his pleadings to delete his prayer for a rescission of the sale and to proceed for a reduction in price and damages.
The building in this case was actually a complex of several buildings with separate roofs varying in height. They were built around 1930. The ice cream company closed in May, 1979 and the buildings were filled with equipment, furniture, machinery, and supplies as well as trash and debris. When Abshire inspected the premises on December 14 there were no lights and he did not go into some of the separate buildings in the complex. He testified that he saw no evidence of leaks or damage to the roof except in one section where the ceiling had caved in, but he was told by Russell that a new roof had been installed over this area; and he was also told by Wunder of Homeseekers and Stringer of Latter & Blum that the building had a new roof. This testimony was corroborated by Abshire's secretary who testified that she heard Russell and Stringer tell Abshire the building had a new roof. This lady testified that she had visited the property in December and "it seemed like a very nice building."
As to termites, Abshire testified that he had just started to move into the premises after the sale when one of his employees called him to the second floor of the building designated "H" and showed him that the floor was separating from the wall. This floor was covered with pallets and cases of ice cream cup lids. Only when these were cleared away was the presence of termites and termite damage revealed. In the interest of safety a portion of the floor was removed.
When Abshire first saw the property there was a Latter & Blum sign stating the building or buildings contained 34,000 square feet. Several days before the act of sale was passed Abshire received an appraisal from Stringer which reiterated the 34,000 square feet measurement.
In 1981 Abshire consulted Andrew J. Sullivan, Jr., a civil engineer and surveyor, to investigate the condition of the roofs on the buildings. Sullivan testified as follows: At the outset of his engagement by Abshire he was given copies of a survey of the property and of the appraisal furnished by Stringer. This appraisal showed 19,000 *140 square feet on the ground floors and 14,964 on the second floors. Immediately Sullivan knew something was wrong because casual observation told him there could not be that many square feet on the second floors if there were 19,000 feet on the first. He was commissioned to measure the square footage and found 19,460 on the ground floors and 6,767 on the second. Included in these figures were 1,965 on the ground floor and 936 on the second floor of one building which was located on a closed street belonging to the City. This combined "encroachment" square footage of 2,901 was excluded from the total by Sullivan to produce a net square footage actually purchased by Abshire of 23,326 square feet.
Abshire's suit in redhibition is based upon the existence of three defects, the condition of the roof, the presence of the termites, and the shortage in square feet. His suit for damages is based upon alleged misrepresentation or concealment by both defendants concerning the condition of the roof and the square footage of the buildings.
Redhibition is the avoidance of a sale because of a vice or defect in the thing sold which renders it either useless or so inconvenient and imperfect that the buyer would not have purchased the thing had he known about the vice. LSA-C.C. art. 2520. Apparent defects, that is, defects the buyer might have discovered by simple inspection, do not constitute redhibitory defects. Art. 2521. Simple inspection involves more than mere casual observation. It requires a buyer who observes defects to conduct further investigation as would be conducted by a reasonably prudent buyer acting under similar circumstances. Estopinal v. Bourshie, 420 So.2d 749 (La.App. 4th Cir. 1982). The first question to be answered in Abshire's redhibitory actions is whether the roof and termite defects which he discovered after he bought the property were discoverable in the kind of an inspection required of him as a prospective purchaser. Another redhibition question is whether the shortage of square footage could in itself constitute a redhibitory defect.
The Commissioner found that Abshire saw or should have seen the roof defects in the buildings. This conclusion was based on evidence of record that the ceiling in one area had collapsed and, in another area daylight showed through cracks in the roof, the buildings were old and in a state of disrepair, and problems involving the roof, walls, ceilings, and overall condition of the building were apparent. Furthermore, the commissioner noted that Abshire failed to discover the condition of the buildings even though he had free access to it from December 14, 1979 until February 18, 1980, when he purchased the property.
These findings are amply supported by the record. Wunder testified that he was shocked to see the condition of the buildings which he described as "deplorable." Russel told of how his men were constantly patching the roof and moving buckets around to catch the water from leaks, and he gave the impression that this is what anyone should expect from buildings of the age and condition these were in. He recalled that one could see light through cracks in the roof in some places and he stated that he would not be at all suprised if there were water stains visible on the walls of the roof. There was also evidence that in one section of the property one could readily see that there had been a fire which left charred beams and other members and signs of makeshift, patchwork repairs. The commissioner also rejected Abshire's contention that all these problems surfaced only after he took title. This is supported by the record. This is not a case where defects were covered up or hidden by cosmetics. It is one where the conditions should have been a red flag to Abshire that there were roof problems if he had but looked.
Abshire candidly admits that he did not make any inspection of much of the building, and he blames this on the absence of light and the presence of obstacles in the buildings. This did not relieve him of the consequences of purchasing the building without inspecting it. If a purchaser buys a building sight unseen and waives any inspection he may not recover for defects *141 which he could have discovered in a relatively simple inspection. From our review of the record we agree with the commissioner that the roof defects were discoverable in the kind of inspection required of a reasonable purchaser under the circumstances and that such defects do not support an action in redhibition or reduction of price.
As to the termite damage, however, the evidence does not support the conclusion that this was discoverable in the type of inspection required of Abshire. From the very limited testimony on this subject it appears that only after some pallets and supplies were removed by workmen after Abshire took possession they noticed the floor pulling away from the wall. This damage was on the second floor of Building H which Abshire didn't even enter before he agreed to purchase it. However, we infer from this testimony that this condition would not have been apparent to Abshire even if he had inspected this area. Only after parts of the floor were removed did Abshire know that termites were present and extensive damage had been caused by them. Simple inspection did not require Abshire to examine inner or hidden parts of the buildings for the purpose of discovering termite damage. Estopinal v. Bourshie, supra; Barker v. Tangi Exterminating Co., 448 So.2d 690 (La.App. 1st Cir.1984); Sharp v. Bozzelle, 420 So.2d 1039 (La.App. 5th Cir.1982). We note that the commissioner apparently overlooked the termite problem because no mention is made of it in his report. Despite our conclusion as to the validity of this claim, the record does not support an award. The testimony is unclear as to how much floor space was lost and there is no evidence as to the cost of replacing the area. We are not persuaded to remand the case to allow Abshire to present this evidence because he has had ample opportunity to do so already and because his recovery would be relatively little considering the highly depreciated condition of the buildings at the time of the sale.
Next we turn to the question of the alleged shortage of square feet. Abshire's principal contention was that Wunder and Stringer deliberately misled him as to the size of the buildings. The commissioner made a specific credibility evaluation in favor of these witnesses and adverse to Abshire. This credibility finding is dispositive of Abshire's claims that Wunder and Strickland purposely deceived him as to the size of the buildings as well as the quality of the roofs and with respect to the Hardie appraisal to be discussed below. Nonetheless, Abshire contends in the alternative Homeseekers' and Latter & Blum's negligence in advertising the square footage of the buildings caused him to buy them and suffer consequential damage.
At the outset, we do not deem this aspect of the case to be an element of the redhibitory action. The size of a building cannot constitute a latent defect. For Abshire to recover anything for this item he must show that his loss was the fault of the defendants.
Wunder testified that he got the 34,000 square feet from an appraisal made by Keith Hardie for a creditor of the ice cream company some time before Abshire got involved with the building and that he (Wunder) simply forwarded this report to Stringer when he listed the property for sale. Stringer accepted the 34,000 square feet and had it put on a sign which was placed on the building. We are satisfied that these individuals were in perfectly good faith and were are unable to conclude that they had any duty to verify the square footage given them by Hardie. Indeed, they were entitled to rely on it.
The commissioner made a number of findings and conclusions in disposing of this part of Abshire's claim. One of these findings with respect to Abshire's own exhibit A-104 is especially persuasive. This was a letter from Stringer to Abshire dated December 11, 1979 enclosing a plot plan which contains a notation that the buildings contain approximately 30,000 square feet. Abshire contends that he got only 23,326 square feet according to Sullivan, but, as the commissioner pointed out, this figure does not include the so called "encroachment" property consisting of 2901 square *142 and the undisclosed amount on the second floor of Building H removed by Abshire before Sullivan made his measurements. When these are added to the 23,326 a figure "approximating" 30,000 is the result.
Furthermore, the commissioner was not bound to accept Sullivan's testimony without question as Abshire contends. In the first place, Sullivan's testimony as to how he went about measuring floor space in the buildings was subject to evaluation for credibility and weight by the fact finder as is any testimony. While Sullivan was an expert and gave testimony as such, his testimony and report on measurements he took constituted fact testimony. His testimony concerning the number of square footage was contradicted by Hardie's report which was in evidence by stipulation and as Abshire's own exhibit. Hardie found the square footage to be 33,964. Interestingly, the discrepancy was not on the ground floors but on the second floors which could only be ascertained by the process of measuring each square inch of these irregular buildings. The margin for error in such a procedure is obvious. We accept as accurate the commissioner's succinct conclusion, ".... the court is uncertain to this day exactly how many square feet of floor space was contained in the buildings at the time of the sale."
Finally, it was not until long after Abshire was occupying the buildings that he decided he had a problem with a shortage of square feet. Sullivan was hired to survey the condition of the buildings and to report on the extent of repairs necessary. From his testimony a casual statement by Abshire that the buildings contained 34,000 square feet led him to start measuring the buildings. It was more than two years after Abshire filed his suit that he first alleged the shortage of square feet in a third supplemental petition. Abshire did not buy the property by square footage. He bought buildings which he thought were large enough for his purposes and indeed turned out to be large enough. The exact square footage was not a motivating cause for him to purchase the buildings. The commissioner's conclusion that "this late blooming complaint of inadequate floor space is not supported by the record, testimony or common sense" is correct.
Abshire's claim for damages because of an encroachment on City property has no merit. The description of the property in the act of sale from Homeseekers to Abshire refers to a survey which is attached, and the act recites:
"The parties hereto take cognizance of the encroachments, as shown on the surveys, above referred to."
The survey clearly depicts along the entire Melpomene Street side of the property a portion designated "Area Leased From City" and shows that parts of buildings and walls are located on this City property. Abshire was charged with knowledge of the contents of these documents which he signed. He does not contend that these obvious disclosures were concealed from him. He contends only that he was not aware of them, but this was his fault and his alone. Again, we agree with the commissioner's observation that Abshire was aware of the encroachment prior to taking title and he waived any right to complain about it when he signed the act of sale. Parenthetically, we note that Abshire has not been deprived of the use of this alleged missing property. This property was leased by the City for $25 per year.
Finally, Abshire contends his loss was attributable to the misconduct of Latter & Blum's agents, Stringer and Archie Helmman in sending the Hardie appraisal to him a few days before the act of sale. Abshire places a great emphasis on the fact that a caption containing Hellman's and Latter & Blum's names and address had been stamped at the top of the first page of Hardie's appraisal survey. Abshire asserts that he was led to believe this was Latter & Blum's own appraisal. He further asserts that this appraisal which fixed the property's value at $602,000 was the reason he went through with the act and that it was deliberately altered and sent by Hellman at this time to mislead Abshire. The commissioner's unqualified rejection of this theory based on the testimony and demeanor of Hellman, Stringer, *143 and Abshire was a credibility call which we accept. Furthermore, the evidence does not support the notion that Abshire was influenced by this appraisal to take title even though he was wavering before he got the appraisal. He had agreed to purchase the property two months previously and had never bothered to conduct a reasonable inspection of the property. He was going ahead with the sale irrespective of the Hardie appraisal. This appraisal had no effect on his decision to purchase the property aside, perhaps, from causing him to think he was making an exceptionally good purchase. But there is no support in the record other than Abshire's testimony, which was discredited by the commissioner, that this appraisal caused him to buy the property.
In his briefs Abshire specified several errors in connection with the district judge's review of the commissioner's report. More specifically, he asserted that he was denied an adjudication of his case by an elected judge because the district judge's reasons for judgment contained words and phrases which indicated that he had simply read the record to determine whether or not the commissioner committed manifest error. Although Abshire seemed to abandon these specifications in his oral argument we note for the record that the procedure employed by the district court was eminently correct.
Following the filing of a report and recommended judgment by the commissioner Abshire filed extensive exceptions and briefing with the district judge. It seems to us from the judge's reasons that he meticulously reviewed the record in passing on Abshire's exceptions and the commissioner's findings. Nothing in the record supports a contrary opinion. We, in turn, after reviewing the entire record, find no legal or factual error in the findings of the trial judge or the commissioner other than their disposition of Abshire's claim for termite damages which is of no consequence in the result.
Accordingly, the judgment is affirmed.
AFFIRMED.

ON APPLICATION FOR REHEARING
PER CURIAM.
In its application for rehearing, plaintiff argues that our discussion of the issue of the alleged shortage of square feet is in conflict with the holding of this court in Bernofsky v. Schwartz, 370 So.2d 590 (La. App. 4th Cir.1979). In that case the court held that a purchaser who relied on an information sheet furnished him by the seller which information sheet overstated the length of the den was entitled to an action in redhibition under C.C. art. 2529. We correct our original opinion by repudiating any language which may be in conflict with the cited case.
However our original result remains because the facts as found by the commissioner and supported by the record distinguish the cases. The evidence established that the property was originally said to contain approximately 30,000 square feet, that this is what the property contained, and that the exact number of square feet was not plaintiff's principal motive for purchasing the property in any event. We agree with the statement of the trial judge in this connection that "the Commissioner did not err in finding that the square footage was not a principal consideration in Abshire's decision to buy the property."
In the Bernofsky case the court found as a fact that the shortage of square feet was highly significant because the exact size of the den as represented by the vendors was one of the principal motives the purchaser had for buying the house.
The application for rehearing is denied.
REHEARING DENIED.